KINGS COUNTY—HON. ROSWELL C. BRAINARD, SURROGATE—September, 1859.

HEGEMAN *v.* FOX.

*In the Matter of the final Accounting of the Executors of* AUSTIN D. MOORE, *deceased.*

A man does not lose his established domicil, and acquire a new one, while his absence is compulsory, or is dependent upon the happening of any

contingent event; yet where a person in ill health is convinced that he cannot live in the climate of his domicil here, and he removes from it,—*Held*, not to be such a compulsory absence, continuing his domicil here, as that a change of domicil may not be established by proof of a fixed intention to abandon it, and to become a permanent resident of some other place.

The deceased, being in ill health, sold his house and furniture, and closed up his business here, and departed for the South, declaring that "he never expected to return; that he expected to make the South his home." He purchased, stocked, and cultivated a plantation in Florida, whither he removed, and lived with his family for over a year, and until his death.

> *Held*, that the domicil of the deceased, at the time of his death, was in the State of Florida, and the widow was entitled to one-third of the personalty, according to the laws of that State.

The question is one of intent, and not whether the deceased was compelled to change his domicil by reason of ill health.

Deceased was a resident of Brooklyn until the fall of 1855, when, by reason of the low state of his health, it became necessary for him to go to a southern climate. Before he left, he made his will, which was duly executed in New York, October 19, 1855, whereby he devised and bequeathed his property to his executors in trust, to pay his widow a monthly sum, to be in lieu of her dower; and after paying certain legacies of small amount, to hold the residue upon certain trusts for his children. The will also appointed testamentary guardians of his children, and desired that they should have the sole custody of them, in exclusion of their mother. On February 10, 1857, the day of his death, he made a codicil to this will, in Florida, by which he revoked the appointment of the executors therein named, and in their stead appointed A. M. Reed, of Florida, and his brother, Asa Moore, his executors. On the final accounting of one of the executors, the widow claimed that the testator was domiciled in the State of Florida, at the time of his decease, and that by the law of that State she was entitled to one-third of his personal estate.

HEGEMAN *v.* FOX.

Benj. G. Hutchings, *for Executors, and* John Dikeman, *guardian* ad litem, *for Infants.*

I. At the time when the testator left here to go South, his domicil was in the State of New York.

II. For purposes of succession, there can be but one domicil; and a domicil once established, is not changed until the party has not only intentionally and decidedly abandoned it, but has actually acquired another, *animo et facto*, by a fixed residence there, coupled with the intention of making it his sole home for the remainder of his life. (*Somerville* v. *Somerville*, 5 *Ves., Jr.*, 750, 787; *Munro* v. *Douglas*, 5 *Maddock*, 379; *Munro* v. *Munro*, 7 *Cl. & Finn.*, 876; *De Bonneval* v. *De Bonneval*, 1 *Curt.*, 859; *Stanley* v. *Barnes*, 3 *Hagg.*, 437; *Bempde* v. *Johnston*, 3 *Ves., Jr.*, 201, 202; *Craigie* v. *Lewin*, 3 *Curt.*, 435; *Whicker* v. *Hume*, 13 *Beavan*, 366; 5 *Eng. L. & E.*, 52; S. C., 7 *Clarke's House of Lords' Cases*, 125; *Lond. Jur.*, October, 1858; *Story on Confl. of Laws*, §§ 41, 44, 47; *Matter of Roberts*, 8 *Paige*, 519, 524; *Matter of Wrigley*, 8 *Wend.*, 133, 139; *Matter of Thompson*, 1 *Id.*, 43; *White* v. *Brown, Wall., Jr., U. S. C. C. R.*, 217.) The *onus* of proving a change is on the party alleging it; and this *onus* is not discharged by proving residence in another place, which is not inconsistent with an intention to return. (1 *Burges' Comm.*, 34, 40; 1 *Curt.*, 864; 7 *Cl. & Finn.*, 891.)

III. A change of domicil is not effected by a residence coupled with an intention to remain an indefinite period of time, dependent upon any contingency, as health, travel, business, or pleasure. (*Phillimore on Domicil*, §§ 146–160, 193; 1 *Binney*, 349; 2 *Bos. & Pul.*, 229.)

IV. A man does not lose his established domicil and acquire a new one, while his absence from such established domicil is compulsory, no matter how long such absence be continued, if the same compulsory reason continue. Such compulsory reasons have been held to be exile; a change of government, endangering a person if he should remain; an office rendering absence necessary, such as the command of

a fortress abroad; the position of an ambassador or foreign minister; and finally, ill health. (*De Bonneval* v. *De Bonneval*, 1 *Curt.*, 859; *Phil. on Dom.*, §§ 140–160; *Story on Confl. of Laws*, ch. 3, § 47, pt. 13; *Johnston* v. *Beattie*, 10 *Cl. & Finn.*, 138; *Haskins* v. *Matthews*, 35 *Eng. L. & Eq.*, 532; *Stanley* v. *Barnes*, 3 *Hagg.*, 437; *Isham* v. *Gibbons*, 1 *Bradf.*, 69; *Elbers* v. *U. S. Ins. Co.*, 16 *Johns.*, 128.) Whether the state of health is such as to make out a case of compulsion, is a question of fact. The removal of the testator was the only hope of life; and though he had concluded never to return, because he had given up the hope of recovery, it cannot be contended that the testator determined not to return in case he should recover his health sufficiently.

V. A well-established domicil once proved, will not be held to have been changed without clear and decisive proof of a fixed intention to change it. In case of doubt, the original domicil will be maintained. (*White* v. *Brown*, *supra; Munro* v. *Munro*, *supra; Lord* v. *Colvin*, *Lond. Jur.*, April, 1859; *Whicker* v. *Hume*, 13 *Beav.*, 366; 5 *Eng. L. & Eq.*, 52.) The acquisition of a dwelling-house is of no importance except as evidence of intention; and what weight is to be given to it in that view depends upon circumstances. (1 *Burges' Comm.*, 54; *Isham* v. *Gibbons*, 1 *Bradf.*, 69; *De Bonneval* v. *De Bonneval*, 1 *Curt.*, 864; *Munro* v. *Munro*, 7 *Cl. & Fin.*, 876.)

JOHN BERRY *and* ALEXANDER W. BRADFORD, *for the Widow.*

I. The succession to personal property is regulated by the law of the domicil of the deceased at the time of his death, as well in case of testacy as of intestacy. (*Phill. on Dom.*, 7.)

II. By the statute of Florida the widow is entitled to one-third of the testator's personalty, provided the testator's domicil be established as claimed. (*Thompson's Digest, Laws of F.*, 184, ch. 11, § 1; 185, ch. 12, § 2.)

III. Domicil is "a residence at a particular place, accompanied with positive or presumptive proof of an intention to remain there for an unlimited time." (*Guier* v. *Daniel*, 1

*Binney*, 349, *note*.) 1. A domicil can be changed only *animo et facto*. 2. To establish a change of the domicil of origin, and the national domicil, requires stronger proof than in other cases. 3. The domicil is not lost, until a new one be acquired. 4. If the change be established, its duration is unimportant.

IV. The reason of effecting a domicil in any particular place is immaterial, provided the intent to effect it appears.

V. He totally abandoned his residence in Kings county, in October, 1855, and there is no proof that, if he ever returned to the North, it was his design to resume his former place of residence. (*Phill.*, 15, n. 6, 118, 122, 126, 128 ; *Story's Confl. of L.*, § 51.) He sold the house in which he lived, and his furniture. He closed his bank account, transferred all his money, and removed his family.

VI. He acquired a domicil in Florida. He purchased a plantation, and resided there for over a year, and until his death. The investment in this plantation, stock, &c., was $25,000 and over, and it presented every appearance of a permanent establishment. He furnished the house, stocked and cultivated the plantation; caused his brother to remove from Ohio, with his wife and family, to take charge of his plantation as overseer. He lived there with his family, his wife and children. He took measures for the education of his children at home, though they had previously been placed at a Northern boarding-school. By codicil he appointed two residents of Florida executors, trustees, and guardians. He instituted legal proceedings, which in their nature implied a residence in Florida.

THE SURROGATE.—In this case the widow of the deceased has refused the provision made for her in the will of her husband, and has elected to take her dower.

She also alleges that her husband, at the time of his death, was a resident of, and domiciled in, the State of Florida, and that by the laws of Florida, she, as such widow, is entitled

to one-third of all the personal estate of which her husband died possessed, as her share thereof.

It appears to be conceded by all of the parties that the law of the domicil governs in the distribution of the assets in this matter. But the executors and the guardian of the infant children of Mr. Moore deny that Mr. Moore was, at the time of his death, domiciled in the State of Florida, and allege that his domicil was in this State.

Upon these allegations a large amount of testimony has been taken, from which it appears that Mr. Moore was born in the State of Massachusetts, where he resided until about the time he became of age. Then he afterwards resided in several places, until about the year 1846, when he came to this State and engaged in business in the city of New York. He soon after took up his residence in the city of Williamsburgh, at which place he purchased and kept a house, accumulated property, paid taxes, and assumed the privileges of citizenship.

All of counsel on both sides appear to take it for granted that Mr. Moore had lost his domicil of origin, and that he was, from the time he settled in Williamsburgh, up to the year 1855, domiciled in this State. During that year (1855) he sold his house and furniture, closed up his business, and started (Oct. 20th, 1855) for the South. In the early part of the year 1856 he purchased a farm or plantation near Jacksonville, in the State of Florida. He also purchased negroes, made some attempts to stock the farm and to improve it. He also induced a brother, then residing in Ohio, to move with his family to Florida, to act as overseer of the plantation. He continued to reside upon this farm until his death, on or about February 10, 1857.

It also appears that Mr. Moore had, for some time previous to his leaving Williamsburgh for the South, been in poor health; that the reason for his going South was, that he could not stand the climate of the North; that he could not live here; and hoped to prolong his life by living in a warmer climate.

The question in this case is, not whether Mr. Moore was compelled by ill health to remove to the South, about which there cannot be a doubt, but whether or not, when he was convinced that he could not live here, but could live at the South, he determined to relinquish his domicil here and to become a permanent resident of some place at the South. Upon this point the testimony of Mr. Demill and Mr. Field is clear, that he broke up his family residence in Williamsburgh and departed for the South; and that he declared at the time of his departure "that he never expected to return," "that he expected to make the South his home."

If these witnesses are to be believed (and they appear to have occupied confidential relations with Mr. Moore, and to be in no way interested in the result of this matter, and to have no motives to conceal or misstate facts), Mr. Moore left with no intention of ever returning to reside here, but, on the contrary, with a fixed intention of residing at the South for the balance of his life. The letters of Mr. Moore, written after he arrived in Florida, are to the same effect. In one of them he states that he is now fully settled in his new home; and in another, that he is not liable to personal taxation in Kings county, because he did not reside there. His acts while in Florida go to show that he intended to make his domicil in that State. He purchased a plantation, sent for his children, and took means to educate them there. He commenced a suit in one of the courts of Florida, and put himself upon the record as a citizen of that State.

In my opinion, it is no matter what were the inducements for his leaving here and going South, provided he left with the intention of residing permanently at the South. Many persons have left a domicil in other States, as Mr. Moore did, and come to New York for the purpose of bettering their circumstances, and not because they preferred New York to the place of their birth as a residence, other things being equal. They came here from choice, and with the intention of residing permanently; but they left their domicil of origin upon a degree of compulsion, being satisfied that it

was not for their interest to remain there. Thus Mr. Moore, in 1855, when he believed his health would be improved or his life prolonged by living in a warmer climate, determined to relinquish his domicil here, and to fix a new one at the South.

It is true, that some testimony has been given to show that he left this State with an intention of returning whenever the condition of his health should permit it. This testimony is not, however, of a satisfactory character. The witnesses do not appear to have occupied any confidential relations with Mr. Moore, and his declaration as given by them may have been made more for the purpose of answering questions put to him, than for disclosing his real purposes. Other testimony has been introduced to show that Mr. Moore, while at the South, and after he had purchased his plantation, expressed an intention of returning to the North. It does not show, however, that when he left his domicil in Williamsburgh it was with the intention of ever returning to it or to this State, and cannot therefore be considered as affecting the testimony of the witnesses Demill and Field, or as rebutting any of the testimony which goes to prove that he left Williamsburgh with the intention of residing permanently at the South.

I feel compelled, therefore, to decide that Mr. A. D. Moore was, at the time of his death, domiciled in Florida. And a decree must be entered, giving to his widow the portion of the estate allowed to her by the laws of Florida, as her distributive share.